**In re MAYWOOD, INC., Debtor.**

**Bankruptcy No. 296–20752–7.**

United States Bankruptcy Court,
N.D. Texas,
Amarillo Division.

June 6, 1997.

Larry Chek, Jenkins & Gilchrist, Dallas, TX, for CIT.

Josiah M. Daniel, III, Winstead, Sechrest & Minick, Dallas, TX, for Debtor.

1. This court has jurisdiction of this matter under 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and Miscellaneous Rule No. 33 of the Northern District of Texas contained in Order of Reference of

Floyd D. Holder, Jr., Lubbock, TX, Chapter 7 Trustee.

William S. Parkinson, Office of U.S. Trustee, Dallas, TX, United States Trustee.

## MEMORANDUM OF OPINION ON CIT'S REQUEST FOR ATTORNEY FEES AND EXPENSES

JOHN C. AKARD, Bankruptcy Judge.

Maywood, Inc. (the Debtor) filed for relief under Chapter 11 of the Bankruptcy Code on October 2, 1996. The court converted the case to Chapter 7 on November 5, 1996. Floyd D. Holder, Jr. is the duly qualified and acting Trustee (Trustee).

CIT Group/Credit Finance, Inc. (CIT) was the Debtors largest secured creditor. CIT declared the Debtor in default in September 1996 at which time the Debtor owed CIT approximately $2,225,000. At the time the bankruptcy petition was filed, the Debtor owed CIT $1,195,850.85 according to CIT's Proof of Claim filed December 17, 1996. Due to the diligent efforts of the Trustee, all secured creditors received full payment of their claims, including, on January 11, 1997, CIT's prepetition claim. The Trustee has substantial additional funds which he hopes to pay to unsecured creditors. Since CIT's lien extended to most, if not all, of the Debtor's assets, the value of CIT's collateral exceeded its debt.

On February 14, 1997, CIT filed an Application for Allowance of Postpetition Interest and Reasonable Fees, Costs and Charges Under Section 506(b) (Application).[1] In its Application CIT, as an oversecured creditor, requested that the Trustee be ordered to pay CIT the following amounts:

| | |
|---|---|
| Postpetition Interest (10–3–96 to 1–11–97) | $70,104.44 |
| Loan Administration Costs and Charges | $28,106.65 |
| Early Termination Fee | $60,000.00 |
| Expert and Appraisal Fees | $11,741.12 |
| Legal Fees and Expenses | $40.558.12 |
| TOTAL | $210,510.33 |

**CIT's Application drew the following three objections:**

1) The Trustee objected to the Application on the grounds that CIT is not entitled

Bankruptcy Cases and Proceedings *Nunc Pro Tunc* dated August 3, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(A).

to the default rate of interest, that the administration costs and charges should be reduced, that the early termination fee should be disallowed, that charges exceeding $2,000 for the real estate appraisal update are not reasonable, and that attorney's fees should not include time spent preparing a suit against the guarantors.

2) The Debtor objected to assessment of postpetition interest at the default rate, the assessment of some of the loan administration charges, the early termination fee, and some of the expert, appraisal, and legal fees and expenses.

3) The United States Trustee objected to payment of interest at the default rate, the early termination fee, payment of certain of CIT's expenses, to clerical and overhead expenses being charged as part of the attorney's fees, and to any fees for time spent attempting to collect CIT's debt from parties other than the Debtor.

## STATUTE

11 U.S.C. § 506 states in pertinent part:
(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

## DISCUSSION

### Default Rate of Interest

CIT alleges the Debtor was in default as of September 4, 1996 and requests that the court allow it interest at the default rate of Prime plus 5% from October 2, 1996 (the date of the Debtor's bankruptcy filing) through November 30, 1996, and at Prime plus 4½% from December 1, 1996 [2] to the date the Trustee paid CIT the principal of its debt. In support of its request, CIT relies on *Bradford v. Crozier (In re Laymon)*, 958

F.2d 72, 75 (5th Cir.1992). The court's reading of *Laymon* differs a bit from CIT's. CIT states that the Fifth Circuit held that "when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest." Certainly, the Fifth Circuit's opinion contains those exact words. *Id.* at 75. However, it continued by stating "In this case, however, the contract included a 10% pre-default rate and an 18% default rate." *Id.* Then the Fifth Circuit concluded by holding that "whether the ... default rate, rather than the ... pre-default rate, should apply in this case must be decided by examining the equities involved in this bankruptcy proceeding." *Id.*

This court cannot find that the equities in the instant case favor the oversecured creditor. CIT received full repayment of its loan to the Debtor, while as yet it is unclear whether the unsecured creditors in this case will receive any distribution whatsoever. Therefore, the court holds that CIT is entitled to receive the contract rate of interest on its claim. If, after all distributions are made in the case (and immediately prior to any proposed distribution to insiders and shareholders) the Trustee has money left in the estate, the Trustee shall pay CIT the balance remaining between the interest it received under the contract rate and what it could have received under the contract default rate had the court decided the equities of the case favored CIT.

### Early Termination Fee

CIT asserts that it should receive an Early Termination Fee as contained in Section 9.2 of its Loan Agreement with the Debtor. In support of its claim, CIT cites the court to *Parker Plaza West Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349 (5th Cir.1991). In *Parker Plaza*, the Fifth Circuit held that a note provision which required payment of a prepayment premium on acceleration complied with Texas public policy and was enforceable. *Id.* at 356. However, the court notes that *Parker Plaza* was not a bankruptcy case. The *Parker Plaza* court considered no equities. It merely considered whether a

---

**2.** The rate changed on December 1, 1996 due to the provisions of the Loan and Security Agreement. See Exh. A to CIT's Application at Section 10.4.

premium to be paid on lender acceleration, rather than on the borrower's voluntary decision to prepay, constituted a violation of Texas public policy. The Fifth Circuit held that it did not.

■ Additionally, Section 9.12 of the Loan and Security Agreement provides that it is to be "GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE OFFICE OF THE LENDER SET FORTH IN *SECTION 10.6(a)* BELOW IS LOCATED." According to Section 10.6(a), the lender's office is located in Chicago, Illinois. When acceleration of a loan is triggered by the lender, Illinois law does not enforce termination fees. *Slevin Container Corp. v. Provident Fed. Savs. & Loan Ass'n,* 98 III App.3d 646, 424 N.E.2d 939, 54 Ill.Dec. 189 (1981).

■ Finally, it is not customary in Chapter 7 cases for courts to award termination fees even though a contract may provide for them. *See, e.g., In re LHD Realty Corp.,* 726 F.2d 327 (7th Cir.1984) (reversing the bankruptcy court's decision to grant a termination fee). *See also In re Duralite Truck Body & Container Corp.,* 153 B.R. 708 (Bankr.D.Md. 1993) (holding that § 506(b), not state law, controls whether prepayment charges are reasonable, denying such charge for the creditor's failure to claim actual damages, and finding such a payment would be "a penalty to Debtors and the bankruptcy estate, as well as a windfall [to the creditor].").

■ This court, in considering a distribution to a creditor over and above that which the creditor would normally expect to receive in a bankruptcy case, must consider the equities. The court notes that CIT received the full amount of its principal and will receive interest in full at the contract rate. CIT offered no evidence of any damages as a result of its decision to accelerate. Indeed, because it received payment early, it had the ability to reinvest those funds. Just as in *Parker Plaza,* the court finds that in this case a distribution of $60,000 to CIT would have an adverse effect on the unsecured creditors. Therefore, the court finds that it is neither reasonable under § 506(b), nor eq-

uitable to award CIT $60,000 as an Early Termination Fee.

### Loan Administration Expenses and Fees

■■ CIT is entitled to receive the reasonable costs and expenses it incurred in protecting its loan. Pursuant to § 506(b), CIT's Application requested $28,106.65 for payment of administrative expenses and charges. The Trustee, the Debtor, and the United States Trustee object to $11,768.19 of that amount which is for the services of J. Castro as a "watchdog" or "collateral analysis monitor." At hearing, James D. Bullock testified that he was Credit Manager for the Debtor and continued to work for CIT for one week on accounts receivable. The Trustee also hired him to work on collecting the Debtor's accounts receivable. Further, Mr. Bullock testified that he was on site in Amarillo at the Debtor's facility during the time Mr. Castro was on the premises. He stated that Mr. Castro spent his time in a private office. Mr. Castro usually came in on Monday afternoon and left on Thursday afternoon or Friday morning. He used his laptop computer to play games, he read the newspaper, and he practiced putting. He watched for money as the mail came in, but did not process the payments. He occasionally called CIT on the telephone. The court finds that Mr. Castro provided no meaningful service to CIT or to the Debtor. Therefore, the court holds that the amounts requested for Mr. Castro are not reasonable expenses under § 506(b) and they will be denied.

The court finds the remainder of CIT's request, in the amount of $16,338.46, payable to a locksmith and to several other independent contractors were necessary and reasonable costs of preserving the Debtor's property pursuant to § 506(b). Therefore, they will be allowed.

### Expert and Appraisal Fees

CIT's Application requested Expert and Appraisal fees in the amount of $11,741.12 as reasonable and necessary pursuant to § 506(b). The Trustee, the Debtor, and the United States Trustee each objected to portions of the request. The Trustee, joined by the Debtor, objects to paying Marshall & Stevens, Incorporated, Valuation and Finan-

cial Consultants located in Los Angeles, California $6,010.48 for an updated real .estate appraisal on the Debtor's property situated in Amarillo. The Trustee complains that the appraisal's property description covered a neighbor's buildings, not Maywood's property. Further, the Trustee states that an MAI qualified appraiser could have been employed in Amarillo for $1,500. The Trustee asks that CIT be reimbursed for the appraisal at $2,000, rather than at the $6,010.48 requested. The United States Trustee also objects to the appraisal fee, but on the ground that the invoice does not state the need for it, when it was done, the time required to do it, the appraiser's qualifications, the appraisal's results, what documentation Marshall & Stevens prepared, or the method of appraisal the company used.

■ After considering the Application, the filed objections, and the testimony at hearing, the court finds that an updated appraisal might have been desirable, but an appraisal on property belonging to third parties did not aid in this case and thus the appraisal fee is neither necessary nor reasonable pursuant to § 506(b). The court sustains the Trustee's, the Debtor's, and the United States Trustee's common objection to payment of $6,010.48 for an update of the 1993 appraisal. The court finds the other expert and appraisal fees requested by CIT in the amount of $5,730.64 reasonable and necessary under § 506(b).

### Attorney Fees and Expenses

■ CIT requests reimbursement of reasonable and necessary attorney fees and expenses pursuant to § 506(b) in the amount of $40,558.12. The Trustee, the Debtor, and the United States Trustee all object to that portion of the fees charged for preparation of a suit against the Debtor's principal shareholder, John Maynard, who was also the guarantor of CIT's loan, as being both unreasonable and unnecessary. After reviewing CIT's Application and Exhibits, the various objections, as well as the testimony at hearing, the court finds that the suit was neither

reasonable nor necessary pursuant to § 506(b). Therefore, the court disallows reimbursement to CIT's attorneys for the $2,000 of attorney time spent on that suit. Further, the court sustains the objection of the United States Trustee and deducts $1,000 for improper charges for clerical duties performed by A. Seitzler, for unnecessary courier and Federal Express charges, for expenses more properly classified as office expenses, for inadequately described attorney's services, for travel not billed at half the rate, and for charges made for copies at unidentified rates. The court allows CIT all other attorney's fees and expenses as requested in the total amount of $37,558.12.

ORDER ACCORDINGLY.[3]

---

**3.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to FED. R. BANKR. P. 7052 which is made applicable to Con- tested Matters by FED R. BANKR. P. 9014. This Memorandum will be published.