In re TRINITY MEADOWS
RACEWAY, INC.,
Debtor.

James Cunningham, Trustee for the Bankruptcy Estate of Trinity Meadows Raceway, Inc., Plaintiff,

v.

American Automatic Sprinkler, Inc., et al., Defendants.

Bankruptcy No. 97–41302–BJH–7.
Adversary No. 98–4069.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Sept. 12, 2000.

Mark Joseph Petrocchi, Colvin & Petrocchi, Ft. Worth, TX, for plaintiff.

Stephen G. Wilcox, Law, Snakard & Gambill, Ft. Worth, TX, for defendants Larry and Curtis Lawley.

## MEMORANDUM OPINION

BARBARA J. HOUSER, Bankruptcy Judge.

This Complaint to determine the nature, validity, and priority of liens asserted by defendants Curtis Lawley and Larry Lawley (the "Lawleys") was tried upon stipulated facts on July 27, 2000.

On March 17, 1998, James Cunningham, Chapter 7 trustee of Trinity Meadows Raceway, Inc. (the "Trustee"), filed this action to determine the nature, validity, and priority of numerous liens asserted against the bankruptcy estate of Trinity Meadows Raceway, Inc. ("Trinity Meadows" or "Debtor"). The Lawleys are two (2) of the defendants named in the action. The Trustee seeks a determination that his $578,000 post-petition payment to the Lawleys satisfies the Lawleys' allowable secured claim.

The Lawleys seek a determination that: (i) advances they made to or on behalf of the Debtor after they purchased certain notes, liens, and security interests from Texas Bank were covered by the "dragnet clauses" contained in the instruments securing the notes and/or were necessary to

preserve the value of their collateral; (ii) the default contract rate of interest should be applied to calculate their allowed secured claim; (iii) the Trustee's $578,000 post-petition payment was only a partial satisfaction of their allowable secured claim; and (iv) they are entitled to recover their costs and reasonable attorney's fees.

The allowance of claims and the avoidance of liens on property of the estate are core matters over which this Court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(B), (K); 28 U.S.C. § 1334. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052; Fed.R.Civ.P. 52

This Memorandum Opinion addresses four (4) issues. First, whether the advances made by the Lawleys to or on behalf of Trinity Meadows are covered by the "dragnet clauses" of the instruments securing the notes. The Court finds that with one exception, the advances made by the Lawleys fall within the future advance or "dragnet" clauses.

Second, whether the Lawleys are entitled to interest on their secured claim at the default contract rate (the "default rate") of eighteen percent (18%) per annum or, in the alternative, what is the proper rate of interest to be applied on the Lawleys' secured claim. The Court finds that the default rate should apply until the entry of an Order for Relief on March 27, 1997. Thereafter, the Court finds that equity favors the application of the non-default contract rate of interest (the "contract rate").

Third, how the Trustee's $578,000 post-petition payment should be applied. The Court finds that this payment should be applied in partial satisfaction of the Lawleys' secured claim as allowed herein.

Fourth, whether the Lawleys are entitled to recover their reasonable attorney's fees and expenses in collecting their claim. The Court finds that the Lawleys are enti-

tled to recover their actual attorney's fees and expenses of $24,456.92 up to the time of trial and their additional reasonable attorney's fees and expenses actually incurred at trial.

## I. CONTENTIONS OF THE PARTIES

### A. Contentions of the Trustee

The Trustee contends that his $578,000 post-petition payment satisfies the Lawleys' allowable secured claim. The Trustee objects to the balance of the Lawleys' secured claim contending that because the Debtor did not contractually agree to the Note Purchase Agreement entered into between the Lawleys and Texas Bank, the "dragnet clauses" contained in the bank's security documents are not applicable to the Lawleys' advances. As such, the Trustee contends that any advances the Lawleys made to or on behalf of Trinity Meadows after they acquired the bank's notes and security documents are not secured, specifically including the $37,000 payment the Lawleys made to Texas Bank on December 3, 1996, the $123,000 payment the Lawleys made to the Texas Racing Commission on December 31, 1996, and the $12,414.95 the Lawleys paid to redeem cash vouchers on or about December 31, 1996. In addition to their not being covered by the dragnet clauses, the Trustee maintains that these advances are not secured because they were made to retain the right to continue parimutuel betting—to maintain the Debtor's racing license—and not to protect the Lawleys' collateral.[1] The Trustee further contends that payments the Lawleys made to security guards to patrol and protect their collateral were excessive and therefore not recoverable as part of the Lawleys' secured claim. Finally, the Trustee contends that the equities favor calculating interest on the Lawleys' secured claim at the contract rate rather than the default rate.

---

1. Texas Bank (and the Lawleys as its assign-    ee) did not have a lien on the racing license.

## B. *Contentions of the Lawleys*

The Lawleys contend that: (i) subsequent to their purchase of Texas Bank's notes and security documents, they made several advances to or on behalf of the Debtor, that these advances were covered by the "dragnet clauses" of the security documents, and that these advances were necessary to preserve the value of their collateral and properly constitute a portion of their allowable secured claim; (ii) their payments to security personnel at Trinity Meadows were reasonable and necessary to protect and preserve their collateral and constitute a portion of their allowable secured claim pursuant to a prior Order of this Court; (iii) interest on their secured claim should be calculated at the default rate; (iv) the Trustee's $578,000 post-petition payment only satisfied a portion of their allowable secured claim; and (v) they are entitled to recover their reasonable attorney's fees and costs.

## II. *FACTUAL AND PROCEDURAL HISTORY*

### A. *The Original Transactions—Trinity Meadows and Bank Texas*

Trinity Meadows was formed in approximately 1989. *See* Pre–Trial Order entered July 27, 2000 ("Pre–Trial Order") ¶ 1. To finance its operations, Trinity Meadows entered into a credit relationship with Texas Bank in 1990. *See id.* Specifically, on November 26, 1990, Trinity Meadows executed a Real Estate Lien Note in the principal amount of $2.1 million in favor of Texas Bank as payee (the "$2.1 Million Note"). *See* Pre–Trial Order ¶ 2; Exhibit A. As security for the $2.1 Million Note, Trinity Meadows executed a Deed of Trust encumbering four (4) tracts of land comprising a total of 203.504 acres. *See* Pre–Trial Order ¶ 5; Exhibit D. This Deed of Trust contained a future advance or "dragnet" clause that provided that the liabilities secured included "[a]ll other loans and future advances made by TEXAS BANK, ... to [Trinity Meadows], and all other debts, obligations and liabilities of every kind and character of [Trinity Meadows] now or hereafter existing in favor of TEXAS BANK...." and provided further that it was effective as to Texas Bank and its successors and assigns. *See* Exhibit D.

As further security for the $2.1 Million Note, Trinity Meadows executed a Security Agreement which granted Texas Bank a lien on "all accounts receivable, equipment, furniture and fixtures now owned or hereafter acquired" by Trinity Meadows. *See* Pre–Trial Order ¶ 8; Exhibit G. This Security Agreement also contained a future advance or "dragnet" clause that provided, in pertinent part, that "[t]he debt includes: any renewals or extensions of the Note; any amounts advanced by Secured Party to protect its security interest in the Collateral; any future amounts advanced by Secured Party at its option to Debtor; any and all other liabilities of Debtor to Secured Party, now existing or later incurred, matured or unmatured, direct or contingent; any costs or expenses that may be lawfully assessed against Debtor for the collection of the Debt, including attorney's fees." *See* Pre–Trial Order ¶ 11; Exhibit G. The Security Agreement also provided that it "... shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns." *Id.*

The $2.1 Million Note was modified, renewed and extended pursuant to a Modification Agreement dated March 4, 1993 at which time the Debtor executed a Deed of Trust encumbering an additional tract of land comprising a total of 6.697 acres, *see* Pre–Trial Order ¶ 6; Exhibits E and I; and was further modified, renewed and extended by a Real Estate Lien Note dated December 21, 1995 in the principal amount of $250,000.00 (the "December 1995 Note"). *See* Pre–Trial Order ¶ 4; Exhibits C, I. The December 1995 Note provided, *inter alia*, that if "it is given to an attorney for collection or enforcement, or if suit is brought for collection or en-

forcement, or if it is collected or enforced through probate, bankruptcy or other judicial proceeding, then [Trinity Meadows] shall pay [Texas Bank] all costs of collection and enforcement, including reasonable attorney's fees and court costs...." Exhibit C.

To secure the December 1995 Note, Trinity Meadows concurrently executed a Deed of Trust encumbering all five (5) tracts of land from the previous two (2) Deeds of Trust (*i.e.*, the four (4) tracts comprising the 203.504 acres and the single tract comprising 6.697 acres). *See* Pre–Trial Order ¶ 7; Exhibit F. This Deed of Trust contained a future advance clause identical to those contained in the deeds of trust securing the previous notes and further provided that it was binding on successors and assigns of Texas Bank. *See* Pre–Trial Order ¶ 11; Exhibit F.

On April 23, 1994, Trinity Meadows executed a Promissory Note in the principal amount of $441,900 in favor of Texas Bank as payee (the "April 1994 Note"). *See* Pre–Trial Order ¶ 3; Exhibit B. The April 1994 Note provided, *inter alia*, that "[Texas Bank] may hire an attorney to help collect this Note if [Trinity Meadows] does not pay, and [Trinity Meadows] will pay [Texas Bank's] reasonable attorneys' fees." Exhibit B.

Each of the Deeds of Trust were properly filed and perfected. *See* Pre–Trial Order ¶ 9. Financing statements perfecting the November 26, 1990 Security Agreement were also properly filed. *See* Pre–Trial Order ¶ 10; *see also* Exhibit H.

### B. *The Note Purchase Agreement*

In October 1996, the Debtor defaulted on its payment obligations to Texas Bank and Texas Bank posted the real property securing its notes for foreclosure. *See* Pre–Trial Order ¶ 12. Trinity Meadows did not cure its defaults and, on October 8, 1996, Texas Bank accelerated the $2.1 Million Note, as modified and renewed pursuant to, *inter alia*, the December 1995 Note and the April 1994 Note (collectively, the "Notes"). *See* Pre–Trial Order ¶ 13.

On December 31, 1996, the Lawleys entered into a Note Purchase Agreement with Texas Bank pursuant to which the Lawleys purchased the Notes and the underlying security documents. *See* Pre–Trial Order ¶ 14; Exhibit I. Pursuant to the Note Purchase Agreement and the accompanying Assignment of Note, Liens and Other Documents, the Lawleys are the current owners and holders of the Notes and the Deeds of Trust, Security Agreement, and Financing Statements executed by Trinity Meadows (collectively, the "Security Documents"). *See* Pre–Trial Order ¶ 14.

At the time the Lawleys purchased the Notes, the total due on the Notes was $498,987.52, which included principal and accrued interest at the default rate. *See* Pre–Trial Order ¶ 16.

### C. *The Lawleys' Cash Advances*

Prior to the execution of the Note Purchase Agreement, Texas Bank agreed not to foreclose on the real property collateral of Trinity Meadows in exchange for a $37,000 payment by the Lawleys. *See* Pre–Trial Order ¶ 15. On December 3, 1996, pursuant to that agreement, the Lawleys paid $37,000 to Texas Bank. *See id.*

On December 31, 1996, immediately after the execution of the Note Purchase Agreement, the Lawleys paid $123,000 to the Texas Racing Commission on behalf of Trinity Meadows. *See* Pre–Trial Order ¶ 17. This payment was necessary to keep Trinity Meadows' racing license in place. *See id.* At or about the same time, the Lawleys paid $12,414.95 on behalf of Trinity Meadows to redeem vouchers held by winning ticket holders. *See* Pre–Trial Order ¶ 18; Exhibit J.

The Lawleys made these three (3) payments at the request of Trinity Meadows' officers and directors. *See* Pre–Trial Order ¶ 19.

### D. *Trinity Meadows is Forced into Bankruptcy*

Trinity Meadows did not cure its defaults on the Notes and in February 1997 the Lawleys posted Trinity Meadows' real property collateral for foreclosure. *See* Pre–Trial Order ¶ 20. On March 4, 1997, an involuntary petition was filed against Trinity Meadows which stopped the Lawleys' foreclosure. The Court entered an Order for Relief on March 27, 1997.

### E. *The Lawleys' Payments to Secure and Protect the Property*

On March 25, 1997, after the filing of the involuntary petition but prior to the entry of the Order for Relief, the Lawleys filed a Motion for Super–Priority Lien and to Shorten Time asking the Court to grant them a super-priority lien under 11 U.S.C. § 364(d)(1) for funds paid to security guards to "secure the racetrack" and to prevent theft of and damage to property of the estate. On June 3, 1997, the Court entered an Order finding, instead, that "[t]he funds expended by [the Lawleys] for the employment of security guards shall be included in [the Lawleys'] secured claim, and shall be an allowed secured claim against the Estate," and ordering that "sums expended by [the Lawleys] for the employment of security guards to patrol and protect the property of the Estate shall be included as part of [the Lawleys'] allowed secured claim against the Estate." *See* Order on Motion for Super–Priority Lien and to Shorten Time, entered June 3, 1997 ("June 3, 1997 Order").

From December 31, 1996 to September 30, 1997, the Lawleys paid the salaries of security guards at Trinity Meadows in the total amount of $72,098.67. *See* Pre–Trial Order ¶ 21; Exhibit K. The Lawleys believed that these payments were necessary to protect their interest in their collateral. *See* Pre–Trial Order ¶ 22.

### F. *The Partial Settlement and the Sale of Property*

Pursuant to an Order entered on August 6, 1997, the Trustee was authorized to sell certain real and personal property of the Debtor (the "Property") free and clear of liens, claims and encumbrances, but with liens attaching to the sale proceeds. *See* Order Authorizing the Trustee to Sell the Real and Personal Property (Exclusive of Accounts Receivable) to the Highest Bidder Free and Clear of Liens, Claims, Encumbrances, and Taxes, entered August 6, 1997.

On September 18, 1997, the Lawleys filed a proof of claim, thereby asserting a secured claim of $896,562.07. *See* Pre–Trial Order ¶ 27; Exhibit M. The Lawleys and the Trustee agreed that at least a portion of the Lawleys' secured claim was not in dispute. *See* Agreed Order for Partial Allowance of Claim of Curtis Lawley and Larry Lawley, entered September 19, 1997 ("Agreed Order"). Accordingly, on September 19, 1997, the Court entered the Agreed Order thereby allowing $578,000 of the Lawleys' claim as a secured claim. *See id.* The Agreed Order "passed for further consideration" the extent and validity of the Lawleys' security interest, made "no finding as to the remainder of the claim of [the Lawleys] or the priority, validity or extent of the liens," and was "without prejudice" to the Lawleys or the Trustee "assert[ing] any claim or defense in this proceeding." *See id.*

On September 30, 1997, the Trustee sold the Property free and clear of liens, claims and encumbrances to a group of investors which included the Lawleys. *See* Pre–Trial Order ¶ 28. On October 3, 1997, the Court entered an Order directing the Trustee to pay the Lawleys the agreed portion of their secured claim ($578,000). Exhibit L. The Trustee made this payment on October 6, 1997. *See* Pre–Trial Order ¶ 23.

The $578,000 paid to the Lawleys represented repayment of "the principal of some advances and of some interest." *See* Pre–Trial Order ¶ 26. It did not include repayment of monies "tendered to Texas Bank

by the Lawyers prior to the purchase of the notes, the payment of Trinity Meadows salaries, redemption of cash vouchers, payments to the Texas Racing Commission and some payments for security guards or default interest." *See id.*

The Lawleys' secured claim is based on the Notes and Security Documents purchased pursuant to the Note Purchase Agreement and this Court's June 3, 1997 Order. *See* Pre–Trial Order ¶ 25. At all times, the Lawleys were materially oversecured. *See* Pre–Trial Order ¶ 24.

### III. *THE LAWLEYS' SECURED CLAIM AGAINST TRINITY MEADOWS*

#### A. *The Cash Advances*

1. *Validity of Future Advance Clauses Generally*

■ The validity of future advance clauses is specifically recognized by the Texas Business and Commerce Code which states, in part, that "[o]bligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment. . . ." Tex. Bus. & Comm.Code § 9.204(c) (West 1973); *see Community Credit Union v. Conte (In re Conte)*, 206 F.3d 536, 538 (5th Cir.2000). However, Texas courts only recognize the application of a future advance clause if the future advances to be secured are "reasonably within the contemplation of the parties to the agreement at the time that it was made." *In re Conte*, 206 F.3d at 536; *Kimbell Foods, Inc. v. Republic Nat'l Bank*, 557 F.2d 491, 495 (5th Cir.1977), *aff'd sub nom., U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Airline Commerce Bank v. Commercial Credit Corp.*, 531 S.W.2d 171, 175 (Tex.App.1975, writ ref'd n.r.e.).

2. *Validity of the Trinity Meadows Future Advance Clauses*

■ Unless it is ambiguous, courts look to the language of the written contract to determine the intention of the parties. *In re Conte*, 206 F.3d at 538 ("Consistent with the parol evidence rule, it is this written objective evidence of intent . . . that controls our analysis.") (citing *Kimbell*, 557 F.2d at 496); *Estes v. Republic Nat'l Bank*, 462 S.W.2d 273, 275 (Tex.1970) ("The law presumes that a written agreement correctly embodies the parties' intentions, and is an accurate expression of the agreement the parties reached in prior oral negotiations.").

Here, the Security Documents contain future advance clauses. The Trustee does not contend that these future advance clauses were included in the Security Documents as a result of mutual mistake. The Security Documents are not ambiguous. The Court therefore concludes that the future advance clauses, as well as the remainder of the agreements, accurately reflect the intention of the parties. *See Kimbell*, 557 F.2d at 496 ("In the absence of some evidence that the 'dragnet clause' was placed in the contract by mutual mistake, the court found that the clause clearly and unequivocally stated the intention of the parties for the land to secure the debtor's other loans from the bank.") (citing *Estes*, 462 S.W.2d at 275–76).

3. *The Lawleys' Right to Secure Advances Made to or on Behalf of Trinity Meadows*

■ Pursuant to the Note Purchase Agreement and accompanying Assignment of Note, Liens, and Other Documents, the Lawleys are the current owners and holders of the Notes and the Security Documents. Exhibit I; Pre–Trial Order ¶ 14. The Security Documents provide that they are effective as to assignees of Texas Bank. As such, the Lawleys have effectively stepped into the shoes of Texas Bank and therefore possess all of the rights of Texas Bank, including rights with respect to any future advances.

The Trustee argues that "[a] future advance clause in a mortgage does not secure

subsequent debt from a debtor to a third party acquired from the third party by the mortgagee." Trustee's Brief for Trial of All Disputes with Larry Lawley and Curtis Lawley ("Trustee's Brief") ¶ 32. In support of this proposition, the Trustee cites *Moss v. Hipp,* 387 S.W.2d 656 (Tex.1965).[2]

In *Moss,* a creditor (George D. Hipp) attempted to secure his original loan to the debtor pursuant to a future advance clause contained in loan documents between the debtor and a third party lender (American National Bank), which loan documents were assigned to Hipp as a result of his subsequent purchase of the bank's debt. *See id.* at 658. On those facts, the Texas Supreme Court found that Hipp's original loan was not within the reasonable contemplation of the parties (the debtor and American National Bank) at the time the agreement and loan documents (containing the future advance clause) were executed. The debtor could not have contemplated that its then outstanding loan from Hipp would be a "future advance" from American National Bank (or its assigns). *See id.; Kimbell,* 557 F.2d at 495 ("[I]n Texas, a future advance clause in a mortgage does not secure a subsequent debt from the debtor to a third party acquired from the third party by the mortgagee.").

However, those are not the facts here, where the Lawleys made advances to or on behalf of Trinity Meadows after they became the owner of the Notes and Security Documents and pursuant to their terms. *See Magnum Machine & Tool Corp. v. First Nat'l Bank,* 545 S.W.2d 549, 550 (Tex.App.1976, no writ) ("The facts in *Moss* and *Wood* are distinguishable. Both cases dealt with claims purchased or otherwise acquired from third parties by the

mortgagee against the mortgagor, and not with subsequent loan transaction [sic] between the mortgagee and mortgagor."). As assignee of Texas Bank, the Lawleys may properly assert the rights created by the future advance clauses contained in the Security Documents.

### 4. The Individual Advances

#### a. The $37,000 Payment to Texas Bank

■ The Lawleys made the $37,000 payment to Texas Bank on behalf of Trinity Meadows prior to the execution of the Note Purchase Agreement. *See* Pre–Trial Order ¶ 15. Because the Lawleys were not the holders of the Notes at that time, this payment is not covered by the future advance clause and is not properly allowable as part of the Lawleys' secured claim.[3]

#### b. The Payments to the Racing Commission and to Redeem the Cash Vouchers

■ Both the $123,000 payment to the Texas Racing Commission and the $12,414.95 payment to redeem vouchers held by winning ticket holders were made subsequent to the execution of the Note Purchase Agreement. *See* Pre–Trial Order ¶ 19. Both payments were made at the request of and with the consent of Trinity Meadows' officers and directors. *See* Pre–Trial Order ¶ 19. These payments or advances were of a type that would have been reasonably contemplated by the parties at the time of the original lending transactions. Thus, these payments or advances are subject to the future advance clauses, and are properly allowable as part of the Lawleys' secured claim.

---

**2.** The Trustee also relied on *Conte v. Community Credit Union (In re Conte),* 217 B.R. 767 (Bankr.E.D.Tex.1998). As the Trustee noted at trial, the Fifth Circuit recently reversed the lower courts in that case. *Community Credit Union v. Conte (In re Conte),* 206 F.3d 536, 538 (5th Cir.2000).

**3.** While the Lawleys' proof of claim included this advance, the Lawleys now concede this, stating in their Pre–Trial Brief that "the $37,000 loan which they made to Trinity Meadows in December, 1996 to pay interest to Texas Bank to prevent foreclosure is not covered by the dragnet clauses." Pre–Trial Brief of Larry and Curtis Lawley ("Lawleys' Brief") ¶ 31.

c. *The Payments to Secure the Property*

The Court previously held that funds expended by the Lawleys to employ security guards to patrol and protect the property were to be included in the Lawleys' allowed secured claim. *See* June 3, 1997 Order. It is undisputed that the Lawleys actually spent $72,098.67 for such security guards. *See* Pre–Trial Order ¶ 21; Exhibit K.

The Trustee conceded at trial that this Court is bound by its prior Order but argued, as in his brief, that "the use of security guards, though allowable, should be limited to a reasonable and necessary expense" and that "a similar service could have been provided at a significant lower expense." Trustee's Brief ¶ 39. However, the Trustee presented no evidence with respect to the reasonableness of the costs actually incurred by the Lawleys. Given this record, coupled with the parties' stipulation that the Lawleys believed these expenses were necessary, *see* Pre–Trial Order ¶ 22, the Court will allow the actual amount expended ($72,098.67) as part of the Lawleys' secured claim.[4]

B. *Application of the Contract and Default Interest Rates*

■ The Notes were in default and were accelerated by Texas Bank in October 1996. When the Lawleys purchased the Notes (December 31, 1996), the outstanding principal and unpaid accrued interest totaled $498,987.52. *See* Pre–Trial Order ¶ 16. One of the Notes provided a contract rate of eight percent (8%) and a default rate of eighteen percent (18%), *see* Exhibit B, while the other Note provided a contract rate of prime plus 2% and a default rate of "the highest legal rate." *See* Exhibit C.

In their papers, however, the parties apply the eight percent (8%) and eighteen percent (18%) rates to both of the Notes. *See, e.g.* Lawleys' Brief ¶ 38; Trustee's Brief ¶¶ 28, 41. The Lawleys contend that the Court should apply the eighteen percent (18%) default rate to the outstanding amount of their claim from the date of the Note Purchase Agreement, or December 31, 1996, to the present. *See* Lawley Brief ¶¶ 38–40. The Trustee contends that the eight percent (8%) contract rate should apply. *See* Trustee's Brief ¶¶ 38–39.

Section 506(b) of the Bankruptcy Code provides that "[t]o the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim...." 11 U.S.C. § 506(b). There is no dispute that the Lawleys were materially oversecured. *See* Pre–Trial Order ¶ 24. But Supreme Court precedent on section 506(b) "does not address the issue of what rate of interest is applied...." *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 74 (5th Cir.1992).

The Fifth Circuit has held that "when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest." *In re Laymon*, 958 F.2d at 75. However, the Court also noted that "whether the default rate, rather than the ... pre-default rate, should apply in this case must be decided by examining the equities involved...." *Id.* at 75.

■ Subsequent to its decision in *In re Laymon*, the Court expanded on its concept of the "equities involved" in *Southland Corp. v. Toronto–Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059–60 (5th Cir.1998). While acknowledging that "[t]he very purpose of equity is to exalt the individual circumstances of a case over law's hard and fast rules," the Court provided several factors to consider in weighing the equities, including the spread be-

---

4. Because the Court finds that, with the one exception the Lawleys now admit is not properly a portion of their secured claim, the advances fall under the future advance claus-
es, *see infra,* it need not reach the issue of whether such payments were necessary to protect the Lawleys' collateral and/or to preserve the value of the collateral.

tween the contract rate and the default rate; whether the creditor obstructed the reorganization process; whether creditors junior to the secured creditor will be harmed if the court applies the default rate of interest; and whether or not other classes will be impaired. *See id.* at 1060; *see also In re W.S. Sheppley & Co.,* 62 B.R. 271, 278–79 (N.D.Iowa 1986).

The Court finds that the equities weigh in favor of the Trustee. The ten percent (10%) spread between the contract rate and the default rate is relatively large;[5] and while there is no evidence that the Lawleys obstructed. the liquidation process, other creditors will be harmed if the Court applies the default rate of interest.[6]

In *In re Maywood, Inc.,* 210 B.R. 91, 93 (Bankr.N.D.Tex.1997), the Court previously held that it would apply the contract rate of interest rather than the default rate when "[the secured creditor] received full repayment of its loan to the Debtor, while as yet it is unclear whether the unsecured creditors in this case will receive any distribution whatsoever." The Court further held that the secured creditor would be entitled to receive the difference between interest at the default rate and interest at the contract rate if funds remained in the estate after payment of other creditors' claims. *See id.*

The Court therefore applies the eighteen percent (18%) default rate to the amounts owed to the Lawleys from the date of the Note Purchase Agreement (December 31, 1996) up to the date of the entry of the Order for Relief (March 27, 1997). The eight percent (8%) contract rate shall apply thereafter. This ruling applies to the amounts due on the Notes on December 31, 1996 ($498,987.52), the subsequent advance to the Texas Racing

Commission ($123,000), the subsequent advance to pay the cash vouchers ($12,414.95), and the salary payments to the security guards ($72,098.67).[7] As in *Maywood,* should funds remain after all other allowed claims are paid, the Lawleys shall be paid the additional interest requested by them.

**C. Application of the $578.000 Partial Payment**

The Court finds that the Trustee's October 6, 1997 payment of $578,000 should be subtracted from the Lawleys' allowed secured claim (as determined herein) on that date. The remaining balance of the Lawleys' allowed secured claim shall accrue interest at the eight percent (8%) contract rate until paid by the Trustee.

**D. The Lawleys' Claim for Attorney's Fees**

The Notes provide for a recovery of attorney's fees if the Notes are turned over for collection. While one of the Notes provided that "reasonable attorney's fees shall be 10% of all amounts due unless either party pleads otherwise," *see* Exhibit C, the other Note does not contain such a provision. *See* Exhibit B. Up to the time of trial, the Lawleys' actual attorney's fees and expenses totaled $24,456.92. *See* Pre–Trial Order ¶ 30; Exhibits N, O. The Trustee does not dispute the reasonableness of these fees and expenses. *See* Pre–Trial Order ¶ 30.

In order to recover attorney's fees and expenses under section 506(b), those fees must be reasonable and necessary. 11 U.S.C § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which ... is greater than

5. *Cf. In re Southland Corp.,* 160 F.3d at 1060 ("The 2% spread between default and pre-default interest rates is relatively small").

6. The Debtor's schedules and statements of financial affairs establish that the Debtor was insolvent (liabilities exceeded the fair value of assets) at the time of the bankruptcy filing.

7. No interest shall accrue on the Lawleys' unsecured claim against the estate for the December 3, 1996 payment to Texas Bank ($37,000).

the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and *any reasonable fees, costs, or charges* provided for under the agreement under which claim rose.") (emphasis added); *In re Maywood, Inc.*, 210 B.R. at 95 (denying certain requested fees under § 506(b) as neither reasonable nor necessary). The Trustee disputes the Lawleys' entitlement to attorney's fees of ten percent (10%) of all amounts due and the Court finds such fees neither reasonable nor necessary. However, the Lawleys' actual attorney's fees and expenses of $24,456.92 are reasonable and necessary and shall be allowed. In addition, the Court will allow the Lawleys the additional reasonable attorney's fees and expenses they incurred at trial.

A Judgment consistent with this Memorandum Opinion will be entered separately.