# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 97-10474
_____

## IN THE MATTER OF:
## THE SOUTHLAND CORPORATION,

Debtor.

## THE SOUTHLAND CORPORATION,

Appellant,

v.

## TORONTO-DOMINION,

Appellee.

_____

### Appeal from the United States District Court
### for the Northern District of Texas
_____

### December 2, 1998

Before REYNALDO G. GARZA, JONES, and DeMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This dispute is about what interest rate should apply to seven and one-half months of repayments under a commercial credit agreement -- the base rate in the contract or the specified default rate. The bankruptcy court determined that the higher default rate applies for the entire period between the pre-bankruptcy default and the effective date of the reorganization plan. The district court affirmed. We also affirm.

The underlying Credit Agreement between the debtor-appellant ("Southland") and the secured creditor-appellees ("the Banks") dates from 1987.  Section 2.05(d) of the Credit Agreement provided that, "effective upon notice from the Agents or the Requisite Senior Lenders at any time after the occurrence of an Event of Default ..., the principal balance of all Loans then outstanding shall bear interest payable upon demand at a rate which is two percent (2%) per annum in excess of the rate of interest otherwise payable under this agreement...."

During the summer of 1990, Southland was attempting to recapitalize.  On July 19, the agent banks sent a letter ("July 19 Letter") notifying Southland it was in default.[1]  These were the key parts of the July 19 Letter from the agent banks:

> [W]e are writing to notify [Southland] that the increased interest rate prescribed in Section 2.05(d) of the Credit Agreement is effective due to the occurrence of an Event of Default.
> In the event that a Capital Restructuring ... is consummated on terms acceptable ... before December 1, 1990, then this notification shall automatically be rescinded, without any further action ..., and such rescission shall be effective as of the date hereof.
> No demand for payment of the additional interest ... is being made by the Requisite Senior Lenders at this time, but the right to make demand pursuant to that Section is expressly and unconditionally reserved.

The contemplated restructuring did not occur before December 1.

---

[1] One event of default had to do with missed interest payments to third-party bondholders (i.e., not to the Banks).  The second event of default was Southland's having $75 million in revolving loans when the amended Credit Agreement permitted only $50 million.

Southland failed to restructure its bond indebtedness with solicitations for tender of debt securities approved by the SEC. The final solicitation became Southland's disclosure statement when it filed a voluntary Chapter 11 petition and a Plan of Reorganization on October 24, 1990. The disclosure statement indicated that Southland was still working to get the Banks to agree to cure, waive, or rescind all defaults.

In December 1990, the Banks, although oversecured, filed proofs of claim that did not explicitly refer to the contractual default interest rate. The amounts of prepetition interest expressly claimed, however, were based on the default interest rate.

The Plan was confirmed in February 1991, with none of the Banks (an impaired class) having voted against it. Section 5.01 of the confirmed Plan provided:

> On the Confirmation Date, the Credit Agreement and the Claims arising thereunder or in connection therewith will be reinstated in full. ... All liens, encumbrances, and other charges securing payment and performance of the Claims arising under or in connection with the Credit Agreement are unaffected by the Plan.

None of the amendments to the Credit Agreement as reinstated made any reference to interest rates.

Later, in March 1991, Southland filed its objections to the Banks' claims. The Banks responded by specifying that their claims included interest at the default rate. The bankruptcy court conducted a hearing on the objection and response in October 1991, based on partially stipulated facts and an uncontroverted

3

affidavit.  The bankruptcy court overruled Southland's objection, awarding the Banks interest at the default rate for both the prepetition and relevant postpetition periods.  Southland and the Official Bondholders' Committee timely appealed to the district court, which affirmed the bankruptcy court's award of default interest.

On appeal, Southland raises three issues: (1) that the Banks did not adequately demand the default interest; (2) that the Plan's "reinstatement" of the Credit Agreement returned Southland and the Banks to their pre-default state; and (3) that the lower courts erred in balancing the equities to determine whether default interest was appropriate.

**II.**

The proper standard of review is the usual one: clearly erroneous as to findings of fact.  See Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.), 40 F.3d 118, 120 (5th Cir. 1994).  No change is effected by the presence of a wholly documentary record.  See Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511-12 (1985).  A finding of fact premised on an improper legal standard "loses the insulation of the clearly erroneous rule," and conclusions of law are "subject to plenary review."  Faden v. Insurance Co. of N. Am. (In re Faden), 96 F.3d 792, 795 (5th Cir. 1996) (internal quotations omitted).  A balancing of equities is reviewed for abuse of discretion.  See

4

<u>Mendoza v. Temple-Inland Mortgage Corp. (In re Mendoza)</u>, 111 F.3d 1264, 1270 (5th Cir. 1997).

**III.**

Southland argues that neither the Banks' July 19 Letter nor their proofs of claim were adequate to trigger the Banks' contractual right to default interest.

Whether the Letter fulfilled the terms of the Credit Agreement is a question of New York contract law. Southland focuses on the language in the Credit Agreement saying that the default interest is "payable <u>upon demand</u>." It contrasts this with the July 19 Letter, which explicitly said that "[n]o demand for payment of the additional interest ... is being made ... at this time."

Southland's reading of the Credit Agreement neglects the first part of the provision at issue. The Agreement says that the higher interest rate is "<u>effective upon notice</u> ... at any time after the occurrence of an Event of Default." The "upon demand" language applies to when the default interest is payable, not when the balance begins bearing it. This dichotomy was precisely what the July 19 Letter contemplated. It began by "notify[ing]" Southland that the default rate was "effective due to an occurrence of an Event of Default," but then said "[n]o demand for payment ... is being made ... at this time." The further conditional waiver of the default interest (if restructuring occurred by December 1) did not affect the underlying notification. Nor did the condition in

5

the waiver come to pass.  The July 19 Letter was sufficient to make the default interest rate effective.

After Southland's bankruptcy petition intervened and the December 1 deadline passed, the Banks did not make a formal demand for the default interest, but Southland should not be able to use bankruptcy's automatic stay to argue that the Banks failed to complete the steps to demand their increased interest.  See In re Texaco Inc., 73 B.R. 960, 968 (Bankr. S.D.N.Y. 1987).  Nor may Southland claim that the December 1 restructuring deadline was somehow extended post-bankruptcy.

Given the prior notification that the higher interest rate was in effect and the failure of Southland to meet the condition in the July 19 Letter's waiver, the proofs of claim filed on behalf of the banks -- although the banks were oversecured and proofs of claim were strictly speaking unnecessary[2] -- sufficiently included by their computation the prepetition amount of interest at the higher rate.[3]

---

[2] See Simmons v. Savell (In re Simmons), 765 F.2d 547, 551 (5th Cir. 1985); see also Fed. R. Bankr. P. 3002, Advisory Committee Note.

[3] Southland's argument that the Banks' receipt of adequate protection payments at the non-default contract rate of interest somehow waived their right to assert a higher rate as part of a confirmed plan is meritless.  Adequate protection payments are different from § 506(b) interest on oversecured claims.  See generally Financial Sec. Assurance v. T-H New Orleans Ltd. Partnership (In re T-H New Orleans Ltd. Partnership), 116 F.3d 790 (5th Cir. 1997).

**IV.**

Southland argues that, even if the Banks properly triggered the default interest, the Plan's reinstatement of the Credit Agreement mooted default interest by restoring the parties to their pre-default state. The bankruptcy court disagreed. It read "reinstate[ment]" according to its dictionary meaning and took account of the prepackaged plan that served as the foundation for the Reorganization Plan.[4] The bankruptcy court determined that the Debtor's intent in the Plan was "to leave the Banks' claims unaltered, to wit: to treat the Banks' claims as if bankruptcy had not been filed" -- not as if the default had never occurred. The bankruptcy court's interpretation of the Plan was correct as a matter of law.

Most of the cases cited by Southland deal with a Code provision that is inapplicable here. For a class to be considered unimpaired, and hence unable to vote on a reorganization plan, § 1124(2) requires both the "cure" of any prepetition default and the "reinstate[ment]" of maturity to pre-default status. Several cases have interpreted this provision to deny default interest rates to unimpaired creditors. See Florida Partners Corp. v. Southeast Co. (In re Southeast Co.), 868 F.2d 335 (9th Cir. 1989);

---

[4] In the disclosure statement from the failed exchange restructuring that preceded bankruptcy, Southland acknowledged that it still needed to reach an agreement with the Banks for waiver of defaults. Southland correctly points out that this language about still needing waivers was not in the Plan. That omission does not, however, lend support to any affirmative inference that the Plan contemplated a "cure" of defaults.

7

Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.), 850 F.2d 1338 (9th Cir. 1988); Levy v. Forest Hills Assocs. (In re Forest Hills Assocs.), 40 B.R. 410 (Bankr. S.D.N.Y. 1984). Because the Banks' claims were impaired, § 1124 does not apply. Nevertheless, Southland argues that the concept of "cure" is fungible throughout the Code, and a plan may cure or waive any default under § 1123(a)(5)(G). See Di Pierro v. Taddeo (In re Taddeo), 685 F.2d 24, 29 (2d Cir. 1982).

This is true as far as it goes, but Southland has not demonstrated that all reinstatements in cases under the Code are accompanied by cures (as they must be to have an unimpaired class under § 1124). Some poorly-reasoned cases have denied default interest to creditors by extending the Entz-White reasoning beyond § 1124 cures.[5] One factually similar bankruptcy court decision cited by Southland fails to support the remedy Southland advocates -- denial of any default-rate interest. Instead, the court found a sufficient "cure" to balance the equities against the higher postpetition default interest rate only when the debtor had already paid "all prepetition interest and charges at the default rate." In re Johnson, 184 B.R. 570, 574 (Bankr. D. Minn. 1995) (emphasis

---

[5] One of these cases plainly misreads Entz-White's ultimate holding. See Citybank v. Udhus (In re Udhus), 218 B.R. 513, 514 (B.A.P. 9th Cir. 1998) (interpreting § 1123 of the Code rather than § 1124). A second case, Casa Blanca Project Lenders v. City Commerce Bank (In re Casa Blanca Project Lenders), 196 B.R. 140, 146 (B.A.P. 9th Cir. 1996), appears to apply "cure" to a sale of assets under § 363 of the Code where there is no statutory reference to that term.

added).  Unlike Johnson, however, we see no reason to discuss, much less apply, Entz-White where the raison d'être of the Ninth Circuit decision, an issue of impairment under § 1124, does not exist.[6]

In this case, as the bankruptcy court correctly found, Southland's Plan language was not intended to be a cure of defaults.  The intent to effect a "cure" could not be inferred from § 1124 because the Banks were not an unimpaired class.  Southland attempts to invoke a § 1124 mantra of "cure and reinstatement," but the Plan merely "reinstated in full" the Credit Agreement.  No part of the Code compels the inference of cure.  The bankruptcy court's reading of the Plan's language was not erroneous.  It is entirely sensible to interpret "reinstate[ment]" as returning the parties to their pre-bankruptcy status, rather than their pre-default status.

**V.**

Finally, Southland argues that the bankruptcy court clearly erred in finding that the balance of the equities allowed default interest for the postpetition period.

Section 506(b) of the Bankruptcy Code provides: "[t]o the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there

---

[6] Apart from the doubtfulness of adopting Entz-White or extending its reasoning in this circuit, we note that Congress, in bankruptcy amendments enacted in 1994, arguably rejected the Entz-White denial of contractual default interest rates.  See Grant T. Stein and Ralph S. Wheatly, The Impact of Cure and Reinstatement on Default Interest, Amer. Bankr. Inst. J., Jul.-Aug. 1997, at 1.  The 1994 amendments (adding § 365(b)(2)(D), adding § 1123(d), and deleting § 1124(3)), however, are inapplicable to this case because Southland's petition was filed in 1990.

9

shall be allowed to the holder of such claim, interest on such claim...."  There is no dispute in this case that the Banks were oversecured and entitled to postpetition interest.  But Supreme Court precedent on § 506(b) "does not address the issue of what rate of interest is applied."  Bradford v. Crozier (In re Laymon), 958 F.2d 72, 74 (5th Cir. 1992).  In Laymon, this court held that "when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest."  Id. at 75. To reach this result, Laymon looked to pre-Code law, which "took a flexible approach" and disallowed a higher default rate if it "'would produce an inequitable or unconscionable result.'"  Id. (quoting In re W.S. Sheppley & Co., 62 B.R. 271, 277 (Bankr. N.D. Iowa 1986)(internal quotation omitted)).  Laymon remanded for the lower court to determine whether a default rate or pre-default rate should apply "by examining the equities involved in this bankruptcy proceeding."  Id.

Even though the bankruptcy court issued its opinion six months before Laymon, it did analyze the equities to determine whether the Banks should receive default interest.  Southland presents three challenges to the bankruptcy court's balancing of the equities: the bankruptcy court improperly placed the burden of proving inequity on Southland; the bankruptcy court did not consider the appropriate factors in balancing the equities; and the equities favored applying the lower pre-default interest rate to the Banks' claims.

10

## A.

The bankruptcy court concluded its opinion by finding that "the Debtor has failed to meet the burden of proof necessary to rebut the Banks' prima facie case." This was probably an artifact of the procedural context of the bankruptcy court's decision, since the Banks' proofs of claim were prima facie valid until Southland produced evidence of equal probative force defeating the proof of claim. See Simmons v. Savell (In re Simmons), 765 F.2d 547, 552 (5th Cir. 1985).

Nevertheless, in the context of determining what interest rate to apply, another presumption did properly operate against Southland. The cases find that a default interest rate is generally allowed, unless "the higher rate would produce an inequitable ... result." Laymon, 958 F.2d at 75 (quoting Sheppley, 62 B.R. at 277). See also In re Terry Ltd. Partnership, 27 F.3d 241, 243 (7th Cir. 1994) ("What emerges from the post-Ron Pair decisions is a presumption in favor of the [default] contract rate subject to rebuttal based upon equitable considerations.").

## B.

Southland argues that the bankruptcy court failed to consider the appropriate equitable factors because it ruled "[w]ithout the benefit of the subsequently released Laymon decision." In articulating the need to examine the equities, Laymon quoted Sheppley and parenthetically noted Sheppley's discussion of six other cases. Southland implies that the

11

bankruptcy court improperly failed to consider the five equitable factors identified in <u>Sheppley</u>.

Apart from the fact that the bankruptcy court cited <u>Sheppley</u> and mentioned some of its factors, Southland's suggestion that a balancing of the equities requires resort to a particular list of factors is by definition flawed. The very purpose of equity is to exalt the individual circumstances of a case over law's hard and fast rules. Thus, <u>Laymon</u> referred to "the equities involved in <u>this</u> bankruptcy proceeding." 958 F.2d at 75 (emphasis added). <u>Sheppley</u> itself stressed "flexibility" and articulated its list of "pertinent factors" after "[r]eviewing the record in the present case." 62 B.R. at 278. Even courts that enumerate the <u>Sheppley</u> factors do not decide their cases exclusively upon them. <u>See, e.g.</u>, <u>Fischer Enters., Inc. v. Geremia (In re Kalian)</u>, 178 B.R. 308, 316 n.19 (Bankr. D.R.I. 1995); <u>In re Consolidated Properties Ltd. Partnership</u>, 152 B.R. 452, 457-58 (Bankr. D. Md. 1993).

## c.

We find that the bankruptcy court did not abuse its discretion in balancing the equities. In addition to some of the factors we highlight below, the bankruptcy court observed that other classes besides the Banks were "unscathed" by the bankruptcy, that the Banks did not "ambush" Southland with their claims for default interest, and that Southland failed to disclose its prepetition restructuring fees to those voting on the Plan.

12

Although there is no set list of equitable factors to consider, we also note that several factors articulated by other courts militate against a finding of inequity here. The 2% spread between default and pre-default interest rates is relatively small. See Terry Ltd. Partnership, 27 F.3d at 244 (3% spread not unreasonable); In re Ace-Texas, Inc., 217 B.R. 719, 724 (Bankr. D. Del. 1998) (2% spread reasonable and appropriate given other cases allowing 3 and 4.3%). The four-month confirmation of the Plan shows that, unlike in Sheppley, the Banks were not obstructing the process.[7] See Ace-Texas, 217 B.R. at 726 (ten-month confirmation). We find it especially significant -- as did the bankruptcy court -- that no junior creditors will be harmed if the Banks are awarded default interest. See id. at 725.

That the Banks received restructuring fees before bankruptcy does not mean that they should be deprived of their additional, bargained-for default interest, which compensates them for the unforeseeable costs of default. See Terry Ltd. Partnership, 27 F.3d at 244. Likewise, as the bankruptcy court noted, it is not inequitable to ask that old and new equity holders wait for the secured creditors to be paid off, especially in light of the original disclosure statement.

---

[7] Southland's claim in its reply brief that the Banks were all the while scheming to assert their claim to default interest only after confirmation is not believable.

13

## VI.

Because the Banks triggered the default interest under the contract, the plan did not "cure" defaults, and default interest at the contract rate was not inequitable, the decision to award the Banks interest at the default rate both pre- and post-petition is <u>AFFIRMED</u>.

<u>AFFIRMED</u>.