**In re CUMMINS UTILITY, L.P., Debtor.**

No. 01–47558–DML–11.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

June 5, 2002.

John D. Penn, Haynes and Boone, LLP, Fort Worth, TX, for debtor.

## *MEMORANDUM OPINION*

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the Court is the Joint Motion of JPMorgan Chase Bank, Fleet Capital Corporation and Key Corporate Capital, Inc. for Allowance of Post Petition Interest, Fees and Expenses Under 11 U.S.C. § 506(b) (the "Motion"; the joint movants

1. Pursuant to the Credit Agreement (defined below), Chase served as agent for the three-lender bank group. Section 9.1 of the Credit Agreement states, "Each lender hereby irrevocably appoints and authorizes [Chase] to act as its agent hereunder...."

2. Fleet succeeded to the participation of BankBoston, N.A., upon the merger of the two entities in 1999. *See* Timothy L. O'Brien, *Bank Deal Unlikely to Spur Other Mergers,* N.Y. TIMES, Mar. 16, 1999, at C6.

3. Objections of Debtor to the Capriotti proffer of May 7 regarding reasonableness of fees were carried by the Court and are sustained.

will hereafter be referred to, respectively, as (1) "Chase" or "Agent" [1], (2) "Fleet" [2] and (3) "Key" and collectively as "Banks"). The Motion was objected to by the above-named debtor ("Debtor" or "Cummins"), the Official Committee of Unsecured Creditors (the "Committee") and the United States Trustee. The Court conducted hearings on the Motion on May 7 and May 24, 2002, during which it heard testimony proffered in support of the Motion from H. Michael Wills ("Wills"), an officer of Fleet assigned to Debtor's loan; Billie Prue ("Prue"), a workout officer of Chase assigned to Debtor's loan; John Koskiewicz ("Koskiewicz"), a manager of PricewaterhouseCoopers, LLP ("PWC"); Robert Starzyk ("Starzyk"), a principal of Morris–Anderson & Assoc. ("MAA"); Chris Capriotti ("Capriotti") [3], the "line" officer of Chase assigned to Debtor's loan; and Tom Connop ("Connop"), a partner at Locke Liddell & Sapp, LLP ("LLS"). Numerous Exhibits were also introduced into evidence in support of the Motion.

Debtor presented by proffer the testimony of Michael Lawrence, its Chief Reorganization Officer, and, through designated portions of his deposition, the testimony of Stephen M. Hitt ("Hitt"), past president of the Debtor.[4] Debtor also introduced sev-

4. Chase filed objections to certain of the designated testimony and cross-designated portions of the deposition. Debtor filed a response to the objection and a motion to suppress. The Court has ruled on the objections of Chase and the Debtor's motion by separate Order. The Court also has before it the examination of Prue pursuant to FED. R. BANKR.P. 2004, which was appended to Fleet's response to Debtor's and the Committee's objections to the Motion. As no party has objected to inclusion of this examination in the record, the Court has reviewed it and considered it for limited purposes (*see* section III.C.3.b., *infra.*) in reaching its decision.

eral Exhibits. Chase (as Agent for the Banks), Fleet, Debtor and the Committee have provided the Court with points of authority, and Chase, Fleet and Debtor presented oral argument at the close of the May 24th hearing.

This matter is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052 and 9014.

## I. *Background*

Though this case was commenced under Chapter 11, from the outset it was Debtor's plan—in which the Banks concurred—to use the Chapter 11 process to liquidate the Debtor's assets in a going-concern mode.[5] It was the hope of the parties that more might be realized through a sale of assets in an operating configuration than if the business were shut down and the assets sold through a traditional liquidation. Though the Court had serious concerns about the use of Chapter 11 to effect a sale of all assets pursuant to 11 U.S.C. § 363,[6] it was persuaded by the parties that Debtor's business was rapidly deteriorating. In view of support for the Debtor's sale strategy from the Banks and, after its organization, the Committee, the Court determined that the strategy best served creditor interests. Accordingly, it ap-

proved sale procedures on October 25, 2001, just nine days after the filing of the Chapter 11 petition. The procedures required initial bids by November 7th and provided for an auction on November 9th. The auction was held as planned, but approval of the sale, originally set for November 21st, was continued to November 28th, at which time the Court approved sale of all Debtor's assets other than cash, causes of action, accounts receivable and a few other items.[7]

On December 28, 2001, the Court authorized payment of all principal and contract rate prepetition interest owed to the Banks. On January 4, 2002, the Court entered an order which, *inter alia,* set aside $950,000, representing cash proceeds of collateral of the Banks, to be held as provision against the Banks' claims under section 506(b) of the Bankruptcy Code.[8]

The Court, based on its experience and the evidence, is convinced, and finds, that the liquidation procedure followed by Debtor resulted in substantially greater return to the estate than if the Debtor had attempted to continue its business in the face of deteriorating revenues or if the Debtor had elected to liquidate under Chapter 7 of the Bankruptcy Code. The Court further finds the first and principal beneficiaries of the Debtor's strategy were clearly the Banks.

**5.** The Court does not find credible Starzyk's testimony that the Debtor was "like a deer in the headlights" and did not know what it planned to do in Chapter 11. The Court observed Debtor's managers during hearings on October 17, the same day Starzyk met them. They seemed in no doubt about the course they intended to follow.

**6.** *See In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983); *In re First South Sav. Ass'n,* 820 F.2d 700, 714 (5th Cir.1987).

**7.** The Court required Debtor to provide disclosure materials describing the sale proce-

dures and chapter 11 to all creditors in advance of the hearing to approve the sale.

**8.** The Debtor was maintaining accounts at Chase well in excess of this amount and (obviously) was not incurring much debt in the ordinary course of business (*see* 11 U.S.C. § 363(b)). The Court thus questioned the need to designate a reserve for claims of the Banks. The parties, however, were in agreement with this procedure, and the Court acquiesced.

Payment of the Banks through an exceptional (vis-a-vis *Braniff*) use of Chapter 11 was only the final act in a lengthy and profitable relationship with Debtors. That relationship predates the December, 1998, Amended and Restated Credit Agreement (the "Credit Agreement"), which (as thereafter amended and subject to forbearance agreements hereafter described), together with applicable law, governs the disposition of this matter. Under the Credit Agreement, the Banks made both a term loan and a revolving loan to Debtor. *See* Credit Agreement, § 2.1. The revolving loan was secured by Debtor's inventory and accounts receivable.

During the relationship with the Banks, Debtor never was in default of payment until the commencement of this case. However, in mid 2000, Debtor defaulted under substantially all its loan covenants. These defaults led the Banks to involve workout officers as well as LLS[9] and PWC to monitor the loans to Debtor. During the period between the initial defaults and the filing of Debtor's Chapter 11 petition, the loans to the Banks were reduced by payments in excess of $10,000,000.[10] During the same period the Banks forbore (pursuant to serial forbearance agreements)[11] from exercising their rights under the Credit Agreement, includ-

ing the charging of default rate interest, while Debtor worked with its lenders to restructure its indebtedness.

Nonetheless, especially in the deteriorating economic environment of 2001 and particularly following the events of September 11, 2001, Debtor's business became progressively less viable. Pursuant to the reports required of Debtor by the Credit Agreement and the forbearance agreements, the Court finds that the Banks were or should have been fully aware of the decline in Cummins' operating results in September and October, 2001.[12]

The Debtor's schedules reflect debt to the Banks at filing of approximately $24,000,000. The schedules also reflect debt to unsecured creditors of approximately $28,500,000 (excluding priority debt of over $1,900,000).[13]

## II. *The Banks' Claims Under 11 U.S.C. § 506(b)*

In the Motion the Banks sought payment under 11 U.S.C. § 506(b) of $846,547.82. This total consisted of (1) interest of $315,161.95; (2) a collateral monitoring fee of $35,000.00 (*see* § 2.3(b) of the Credit Agreement); (3) an audit charge of $9,474.36; (4) wire charges of $1,828; (5) attorneys fees and expenses[14]

---

9. LLS had been involved in negotiation and drafting of the Credit Agreement and has acted as Agent's counsel since, including throughout the workout efforts preceding the Chapter 11 filing.

10. Between October 4, 2001, when the Agent was advised of Debtor's intent to file Chapter 11, and October 16, 2001, when the filing occurred, debt owed on the revolving loan was reduced by almost $1,800,000. *See* Banks' Exhibit CC, Monthly Statement directed by Chase to Cummins.

11. To the extent relevant to the Court's decision, the terms of forbearance, as set forth in a letter agreement of February 12, 2001

(Banks' Exhibit LL), were adopted by subsequent agreements.

12. During cross examination on May 7th, Prue admitted being generally aware of Cummins' increasing distress.

13. The Court takes notice of its records; the scheduled debt is not inconsistent with amounts represented to the Court at various hearings, the records of which the Court incorporated on May 24th for purposes of its consideration of the Motion.

14. Though the Banks claimed PWC and MAA were hired through LLS and, thus, their work product was privileged, amounts owed to the

of $320,632.89 incurred by (a) LLS as Agent's counsel ($231,410.91), (b) Fleet's counsel Vinson & Elkins ("V & E") ($87,-971.98), and (c) Key's in-house counsel ($1,125.00) [15]; (6) Consultant fees of $146,088.79 incurred by PWC ($24,975.00) and MAA ($121,113.79); and (7) travel expenses of bank employees from Chase and Key of $18,486.83. The Banks filed a Correction and Supplement to the Motion on May 3, 2002 and further corrected and amended the amounts sought at the May 7th and 24th hearings and thereafter to account for additional fees and errors made in prior computations. The Banks currently seek a total of $872,776.44, some of which was incurred prepetition.

It is the position of the Banks that the fees and expenses sought are "reasonable" within the meaning of section 506(b). The collateral monitoring fee, they say, is an annual fee accruing in total on November 1st of each year—and 2001–2002 should be no different than any other year. They claim they are entitled to interest at the default rate because in the forbearance agreements they specifically preserved the right to charge it (see Letter Forbearance Agreement of February 12, 2001, §§ 6 and 9). The Banks argue that applicable case law sets a three part test for charging interest at the default rate (that the charge will not harm other creditors; that the difference between the default and the regular rate is not punitively great; and that the over-secured creditor has not obstructed the bankruptcy process). The Banks assert they meet this three part test and that the default rate is appropriate to compensate "for the uncertainty of bankruptcy" (Motion, p. 9) and for the added work required of the Banks' internal staffs (testimony of Capriotti on May 24th).

Debtor, joined by the Committee and United States Trustee, disagree about the proper interest rate. Seeing the Banks as obstructive [16] and pointing to the prospect of little return on unsecured claims, they

consultants are separately reflected in the Motion and have been consistently dealt with independently of LLS. Apparently the Banks paid the consultants directly (though the consultants' statements were to LLS and were passed through LLS to the Banks), chose them (MAA was Fleet's choice and, according to Connop's May 24th testimony, may have even contacted LLS rather than being contacted by LLS) and often gave them their instructions. The Banks had a fine line to walk: the applicable provision of the Credit Agreement (§ 10.9; the Banks also cite § 10.10 as support for the award of fees, but this provision deals with indemnification of the Banks against third party claims) allows for "reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees)," and the Banks wished the privilege enjoyed with LLS to extend to the consultants. On the other hand, the forbearance agreements (which expired October 1, 2001) specifically authorize the Banks to hire, and direct Cummins to give access to, "financial advisors." See Letter Forbearance Agreement of February 12, 2001, §§ 7 and 8. The

situation is further confused by Agent's contention that MAA was hired as a "custodian" pursuant to § 10.21(e) of the Credit Agreement. The Court believes post-petition retention at estate expense of a custodian would have been inconsistent with 11 U.S.C. §§ 101(11) and 543.

15. Only Key charged time for in-house counsel, though Chase also used the services of in-house counsel.

16. Debtor and Banks devoted a good deal of time to the issue of whether the filing was a "surprise." The Court finds that no experienced banker familiar with the Debtor could have been surprised by the filing. On the other hand, Debtor argues that Banks delayed both the filing and the sale. Despite the coincidence of a substantial reduction in the Banks' debt on October 15th, the day before filing, the Court finds no evidence to support the inference that the Banks acted other than as prudent lenders in their actions in these respects.

urge the Court to authorize only the contract rate. As to fees and expenses, Debtor, joined by the Committee and United States Trustee, argues the amounts sought are *not* reasonable and should be disallowed or substantially reduced. As to the collateral monitoring fee, it should be prorated or off-set against any fees awarded for the services of MAA.

## III. *Discussion*

### A. *Scope of 11 U.S.C. § 506(b)*

■ Section 506(b) of the Code[17] is subject on its face to two limitations in its application. First, because it refers to interest and "reasonable fees, costs or charges" which may be added to an "allowed secured claim," it relates only to postpetition accretions. *See Rake v. Wade*, 508 U.S. 464, 469–470, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). Prepetition interest and fees are allowable (if at all) as part of the underlying secured claim. In fact, the standard for allowance of interest, fees and expenses under section 506(b) is established by federal law, while like items charged prepetition are tested by applicable state law. *See In re Trinity Meadows Raceway, Inc.*, 252 B.R. 660, 669 (Bankr. N.D.Tex.2000) (default rate chargeable until order for relief, contract rate thereafter required by equities); *See Blackburn–Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.)*, 794 F.2d 1051, 1056–57 (5th Cir.1986) (". . .

Congress intended that federal law should govern the enforceability of attorney's fee provisions in bankruptcy.").

To the extent, therefore, that the Motion seeks interest or fees for the prepetition period it is DENIED without prejudice to recovery of such interest and fees through the proof of claim filed by the Banks.[18] Should any party wish to object to the Banks' claim, the Court will consider that objection in due course.

■ The other limitation in section 506(b) is that allowance of fees and expenses is subject to section 506(c), which permits assessment against a secured creditor's collateral of "reasonable, necessary costs and expenses of . . . disposing of [the collateral] to the extent of any benefit to the holder of the [secured] claim." In this case the value of the collateral sufficiently exceeded all claims of the Banks to cover the amounts sought by the Motion as well the cost of the collateral's disposition. Section 506(c), however, is useful to the Court's analysis in that it supports the view that the benefits to secured creditors of a bankruptcy case ought to be considered in assessing their cost to unsecured creditors. In the instant case, as noted *supra*, the principal beneficiaries of Debtor's strategy of liquidating in a going concern configuration were the Banks. This followed more than a year of the Debtor working with the Banks during which time

---

**17.** Section 506(b) states:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

**18.** The Agent filed a proof of claim for the Banks on March 8, 2002. The claim was the

first time the Court has identified in the record that the Banks actually demanded the default interest rate (though Connop pointed out, *inter alia*, at a January 4, 2002 hearing that the Banks believed they were entitled to the default rate), and it seeks (without quantifying) fees and expenses permitted under the Credit Agreement. The audit fee charged by the Banks was prepetition and will not be dealt with any further in this memorandum opinion since it is properly includible in the claim.

the Banks reduced their exposure by over $10,000,000 and Debtor accumulated approximately $28,000,000 in unsecured trade debt.

## B. *Interest*

■ The Banks should receive interest at the default rate unless application of a lower rate is found proper upon a balancing of the equities.[19] *Southland Corporation v. Toronto–Dominion (In the Matter of Southland Corp.)*, 160 F.3d 1054, 1060 (5th Cir.1998); *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir.1992); *In re Maywood, Inc.*, 210 B.R. 91, 93 (Bankr.N.D.Tex.1997).

This balancing of the equities is not, as the Banks would have it, limited to three factors. The Court may take into account the other facts and circumstances of the case. Here, without charging default interest for more than a year outside of bankruptcy, the Banks seek the bonus of the higher rate during a bankruptcy case, the initial thrust of which was to liquidate the Banks' collateral in the most profitable manner.

The Court does not find credible the Banks' assertion that the Chapter 11 filing added to their risk. On the contrary, the layers of protection afforded a secured creditor by the Bankruptcy Code (e.g., sections 361, 363(c), 506 and 1109), the oversight of the Debtor by the United States Trustee and the Court, and the Debtor's duty as a fiduciary for its creditors, including the Banks (*see, e.g., Dodson v. Huff*

*(In re Smyth, III)*, 207 F.3d 758, 761 (5th Cir.2000); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir.1977)), should have given the Banks added comfort that their collateral was protected.

Moreover, the Banks' assertion that bankruptcy meant more work for the Banks' staffs does not support the award of interest at the default rate. Capriotti testified that the added work was necessary to analyze additional data produced by the Debtor and by the lawyers and consultants used by the Banks. Having elected to increase the information available to them, the Banks should absorb the costs of utilizing it as part of overhead.

■ As to the three factors cited by the Banks, these also do not support the award of interest at the default rate. While the Court finds that the Banks did not obstruct the reorganization process, the Banks' ambiguity about their intention to charge the default rate (Capriotti's and Connop's testimony on cross-examination on May 24th) is significant. As suggested in *Southland* ((160 F.3d at 1057–1058, 1060) ("the Banks did not 'ambush' Southland with their claims for default interest")), the Court concludes that the failure of the Banks to put other parties on notice of invocation of the default rate weighs against its allowance.[20] The Court is also mindful that Chase had the benefit of substantial funds kept on deposit by Debtors. Because of the restrictions on Debtor's use of these funds, the deposits had the characteristics of a compensating balance.[21]

---

19. The default interest also must be provided for in the agreement of the parties. In this case there is no dispute that this requirement is met.

20. The Banks had numerous obvious opportunities to clarify their intent to charge the default rate—e.g., repeated hearings on use of cash collateral. For example, Connop's state-

ment at the January 4th hearing left the Court with the impression the issue remained open.

21. Debtor made much of the Banks' failure to pay interest on the deposits at Chase, and the parties spent considerable time during the evidentiary hearings squabbling over whose fault it was that interest was not paid. The Court finds it unnecessary to resolve this issue, since the fact is that Chase had the bene-

Finally, the Banks appear to have benefitted through Debtor's failure to pay unsecured creditors prepetition. Not only is the unsecured trade debt in this case substantial, but Debtor was inundated with reclamation claims [22] to inventory the ultimate sale of which helped satisfy the Banks. While none of this amounts to obstruction of the process, it does constitute equitable grounds to deny default interest.

With respect to the "spread" between the default rate and the contract rate, the Court rejects the Banks' argument that 2% is too small to be inequitable. The "spread" must be considered in the context of the times. While a 2% spread may be relatively small (*Southland*, 160 F.3d at 1060) when the prime interest rate is in double digits, in late 2001 and early 2002 the prime rate charged by Chase varied from 4.75% to 5.75% (according to Connop's testimony on May 24th).[23] During that same time Chase was paying interest to depositors of approximately 2%.[24] In this environment 2% is *not* a small spread. Further, the spread accounts for approximately $55,000 of the Banks' section 506(b) claim. In a case where unsecured creditors are likely to have received less than ten cents on the dollar, $55,000 is a meaningful amount of money.

 This leads to the most important reason for denying interest at the default rate: the return to unsecured creditors in this case most likely will be minuscule. As noted by the *Southland* court, the impact on other creditors is the most important issue in deciding and whether default interest is appropriate:

> [O]ther classes [of creditors] were "unscathed" by the bankruptcy....
>
> We find it especially significant ... that no junior creditors will be harmed if the Banks are awarded default interest.

160 F.3d at 1060. Where unsecured creditors are not being paid in full (or at least close to it), allowing interest at the default rate is inappropriate. *See Maywood*, 210 B.R. at 93; *Trinity Meadows*, 252 B.R. at 669.

For the foregoing reasons, the Court concludes the burden necessary to avoid the default interest rate has been met. Thus, pursuant to section 506(b) the Banks shall be allowed interest on their secured claim at the contract rate from October 16 through December 31, 2001. As to postpetition interest, the Motion will otherwise be DENIED.

### C. *Professional Fees*

The professionals in this case—whether employed by the Banks or other parties—would have the Court accept that this has been a large, complex proceeding. From the evidence before the Court, however, it cannot so conclude. Indeed, the case

---

fit of the deposits. As Capriotti testified, Debtor's deposits would not have been treated differently from other bankruptcy deposits and so benefitted Chase.

22. Attorneys for Debtor and the Committee both expended much time and effort on reclamation claims by creditors such as Cooper Lighting, Inc., and Nexans Energy USA (*see, e.g.*, Banks' Exhibit CCC). The record of this Chapter 11 case reflects that the Debtor and the Committee had to devise a special system to manage the many reclamation claims.

23. The contract rate of interest was 1.25% over Chase's prime rate. *See* Credit Agreement, definitions of Prime Rate, Applicable Margin and Alternate Base Rate. Though the latter provides alternatives to prime rate, testimony indicated the prime rate would be applicable to all calculations pertinent to the Motion.

24. *See Rates as of Wednesday, Nov. 7, 2001*, NEWSDAY, Nov. 7, 2001 at A75; *Rates As of Wednesday, Jan. 16, 2002*, NEWSDAY, Jan. 17, 2002 at A53.

would be better characterized as a "chapter 3" case than a Chapter 11, for its focus was on the quick sale of the Debtor's assets under 11 U.S.C. § 363, albeit on a going concern basis. This view of the case is consistent with Connop's argument that conversion to Chapter 7 should have occurred after sale of Debtor's assets (oral argument, May 24th).

While a few of the issues presented in this case appear to be novel, the Court questions the insistence of the Banks and the Debtor [25] that this Chapter 11 required the continuous involvement of high-powered professionals. Incurrence of excessive fees by the Banks is especially troubling given the early satisfaction of their debt. The Court finds that the Banks anticipated or should have anticipated, if not as of the date of filing, no later than November 10, 2001, being paid in full.[26] Section 506(b) is not intended as a carte blanche for secured creditors to dun the estate. The Motion must be viewed in this light.

1. *Reasonableness*

Both section 506(b) and the Credit Agreement specify that Banks are entitled to "reasonable" attorneys' fees and expenses. While the Credit Agreement is governed by New York law in determining "reasonableness" (§ 10.3), in its assessment of what is "reasonable" under section 506(b) the Court must apply federal law. *See Hudson Shipbuilders*, 794 at 7.2d at 1056–7; *Chase Manhattan Bank, N.A. v. Wonder Corporation of America*, (*In re Wonder Corporation of America*), 82 B.R. 186, 190 (D.Conn.1988). In applying section 506(b) to a lender's professional fees, a number of factors must be considered. The Court of Appeals for the Fifth Circuit has tested a secured creditor's attorneys' fees by the same standards as those applied to counsel employed under 11 U.S.C. § 327 or § 1103.[27] The Court also may consider "the nature of the case and manner of its administration." *Wonder Corporation*, 82 B.R. at 191; *see also In re Beyer*, 169 B.R. 652, 656–57 (Bankr. W.D.Tenn.1994); *Hudson Shipbuilders*, 794 F.2d at 1058. Finally, the Court must determine whether the services performed were duplicative or unnecessary. *See id.; see also Wonder Corporation*, 82 B.R. at 190. The test for awarding professional fees is *not* simply a showing that the secured creditor believed the services were

**25.** The Committee has distinguished itself by using junior attorneys for most tasks and by suiting its use of accountants to the size of the case.

**26.** Had the Banks shared with the Court the analyses done by MAA, there might be a basis to find otherwise. As it is, given the evidence regarding the Banks' and Prue's expectations at the November 9 auction; payment of almost $7,000,000 immediately after the auction from collected receivables; Koskiewicz's testimony that the Banks were fully secured eight months prior to filing; Wills' assumption that the Debtor would pay V & E's fees; and the Banks' lengthy involvement prepetition with the Debtor, the Court is convinced, and finds, that the Banks knew or should have known by the time the auction was complete that they would be paid in full. The Court's occasional comments (*e.g.*, at the November 21st hearing on approval of Debtor's retention plan) which acknowledge the Banks' concerns about administrative insolvency and accompanying rulings that take into account such a possibility were of course made without the benefit of what the Banks knew and do not constitute a prior finding that payment of the Banks in full was in doubt.

**27.** *Hudson Shipbuilders*, 794 F.2d at 1058, citing as the standard for determining reasonableness the test articulated in *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977) and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *see also In re Welzel*, 275 F.3d 1308 (11th Cir. 2001).

necessary. *See Wonder Corp.* and *Beyer,* both of which specifically reject such a standard.

■ In the instant case, considering (1) the early reduction of the Banks' collateral to cash, (2) the circumstances of the case and (3) the necessities the lenders faced, the Court finds that only limited professional fees were warranted. Even Starzyk testified that by late November 2001 he foresaw payment in full of the Banks,[28] and payment occurred at the end of December. In early January Debtor even offered to pay the Banks' section 506(b) claim, including interest calculated at the contract rate (letter from John Penn to Connop of January 7th, Debtor's Exhibit 7).

As to complexity, difficulty and other factors *Hudson Shipbuilders* requires the Court to consider, only that regarding time constraints weighs in favor of higher costs. Otherwise this case, in the Court's judgment, did not merit the professional attention it has received.[29]

### 2. *Claims against the Banks*

■ Before turning to specific professionals, the Court must address whether the Banks are entitled to reimbursement for costs incurred in defending against discovery designed to uncover challenges to their secured claim. The Court concludes

that payment of some fees and costs directed to this purpose is appropriate in this case. The Court does not base this conclusion on *In re Auto Specialties Mfg. Co.,* 18 F.3d 358 (6th Cir.1994), cited by Fleet. The Court believes the instant case is distinguishable from *Auto Specialties* because in that case the Sixth Circuit concluded that the adversary proceeding for which fees were sought was brought against the secured creditor to avoid any payments required by the agreements of the parties.

Here, discovery was undertaken in good faith after payment of most of the secured claim. Had the claim been paid in full—or had Debtor tendered or sought authority to tender payment of the balance remaining after December 28, the Court might not approve fees sought for preparation for and defense of discovery. As it is, the Banks were still seeking to collect part of their claim when the discovery was pursued. Since their claim was still partly outstanding, they are entitled to reasonable fees in connection with Debtor's and the Committee's discovery.

### 3. *Specific Professionals*
#### a. *LLS*

■ The Court has reviewed the statements provided by LLS. The Court is not

---

**28.** Absolute certainty of full payment of the Banks would not be required to subject future services by the Banks' professionals to question regarding reasonableness. After November 9th, the principal remaining tasks affecting the Banks were (1) documenting sales and (2) collecting receivables. The former was principally the responsibility of counsel for the seller (Debtor) and the latter was the problem of Debtor's personnel. Even if the Banks remained concerned about full payment after November 9 (and the Court finds the concern could not have been great; Prue testified the auction bid was satisfactory to the Banks), the die was cast, and the course of the case was fixed.

**29.** Chase has submitted as an Exhibit an analysis of fees charged by Debtor's counsel to show the reasonableness of the fees the Banks seek. Banks' Exhibit CC. The Court has not finally allowed the fees of Debtor's counsel. Rather, it has permitted their payment subject to counsel addressing issues raised in an unpublished memorandum opinion dated March 22, 2002. Moreover, there is an inherent difference between representing a debtor and representing a lender in bankruptcy. For these reasons the Court does not find the comparison put forward by Chase persuasive.

prepared to challenge hourly rates which, though high, are consistent with those charged by other firms for services in a bankruptcy case. The Court also finds that Connop, who charged the highest rate, by performing many tasks himself and by avoiding the use of multiple lawyers in a given task, achieved a degree of efficiency. On the other hand, the Court is troubled by the time spent on Chase's "form cash collateral order" (over 20 hours; see Banks' Exhibit DD, time entries beginning with 10/10/01 entry for L.J. Hubenak). The time spent on WARN act issues is also excessive—especially as the research was performed by several attorneys. Though Connop acted alone in court, there are entries for numerous intra-office conferences. At one point Hubenak, a $325/hour partner, is used for a UCC search (10/29/01 entry). The Court, however, will not adjust the award to LLS based on these items, which do not have a sufficient aggregate affect on reasonableness to merit a reduction in the allowance. Viewed holistically, the total cost to the Banks for the services of LLS is reasonable.

On the other hand, for the reasons stated in the conclusion to this Memorandum Opinion, the fees sought for preparing and prosecuting the Motion are unreasonable. The Court concludes that LLS should be allowed no fees for preparation and prosecution of the Motion. Respecting the balance of LLS fees, incurred from October 16, 2001, the Motion will be GRANTED.

### b. *V & E*

■ V & E was retained by Fleet, supposedly because Fleet anticipated it would be singled out as the villain in any equitable subordination action.[30] Wills testified he was also not familiar with the abilities of LLS—though Fleet had depended on the competence of LLS [31] since the drafting of the Credit Agreement, including during the lengthy period prepetition when Cummins was in default (Capriotti proffer, May 7th; see also, Credit Agreement, § 10.9).

The Court finds that V & E's services, though undoubtedly well-performed, were unnecessary and duplicative of those of LLS with the exception of (1) the Cooper Lighting, Inc., reclamation claim, discussed below, and (2) assisting Fleet in discovery directed against it. Regarding the latter, based on V & E's January 2002 statement, outside of time spent on document production [32] and preparing for Wills' deposition, Fleet's counsel was focused on discovery vis-a-vis Chase and Key. Even if Fleet were entitled to be paid for overseeing Connop's conduct of that phase of discovery, the Court does not find V & E's contribution to be have been significant. For example, during the Prue Rule 2004 examination, a V & E lawyer made several

---

30. Though Fleet's conduct could have been singled out in an equitable subordination action, the Banks filed one joint claim. It is that claim which would have been contested under 11 U.S.C. § 510(c). The Court is confident LLS could and would have adequately defended any attack on that claim. The fact that Wills wished the comfort of counsel dedicated only to Fleet's interest is not enough to justify payment of V & E's fees and expenses. See, e.g., Wonder Corp., 82 B.R. at 190. V & E's statements, Banks' Exhibit EE, moreover, include few Fleet—specific time entries.

31. LLS is one of the premier firms in the Dallas–Fort Worth area with extensive experience in representing secured creditors.

32. The entries regarding document production include many indicating V & E's effort was in cooperation with LLS. See, e.g., D. Stewart time entry, 01/02/02, M. Crocker time entry 01/03/02, M. Crocker time entry of 01/17/02, Banks' Exhibit EE. The Court is thus unable to determine the amount of time V & E spent on Fleet's (as opposed to the Banks' generally) document production.

technical objections but left defense of the deposition mostly to Connop. See, similarly, the Hitt deposition, taken in connection with the Motion.

Fleet also misconstrues applicable law. At p. 9 of its response to Debtor's objection to the Motion, Fleet notes that the Court's "role is not to allocate funds based on what may be fair-it is to allocate funds based on entitlement and priority." Yet the Credit Agreement does not *entitle* Fleet to its fees any more than to default interest; the fees must meet a reasonableness standard imposed by Congress, which often parallels the very fairness Fleet disclaims. Likewise, Fleet complains of the length of the "lien review period" allowed under the Court's orders (response, p. 10; *see* Interim Order (i) Authorizing the Use of Cash Collateral and (ii) Providing Interim Adequate Protection, ¶ 3). Yet the *statutory* lien review period is two years (11 U.S.C. § 546(a)(1)(A)). The Court's orders actually limited the time available to the Debtor and unsecured creditors to challenge liens. Limiting the review period benefitted Fleet and the other Banks.

Finally, Fleet suggests V & E's fees should be paid because the Court must be "generous enough" to encourage attorneys and others to participate in bankruptcy cases. While this may be true of professionals retained under the Bankruptcy Code, the chapter 11 process will not benefit from encouraging employment by a bank group of multiple counsel. On the contrary, where, as in the instant case, the lenders are well represented through the agent bank, the Court should discourage loan participants from "piling on" to the detriment of other creditor constituencies.

V & E did act on behalf of the Banks with respect to the reclamation claim of Cooper Lighting, Inc., due to LLS having a conflict. In its response Fleet approximates the fees in the Cooper matter at $4,500. At oral argument, however, counsel asserted the amount was $11,000. At the May 24th hearing the Court suggested Fleet submit a copy of its statements marked to show work on Cooper Lighting, and on May 30th Fleet provided a breakdown of its fees showing approximately $9,300 spent on "Reclamation".[33]

■ Mindful that the Credit Agreement appears to allow each of the Banks to retain counsel as an out-of-pocket expense (Credit Agreement, § 10.9(b)) the Court concludes that Fleet is entitled to some reimbursement for V & E's services. At over $108,000, after adjustments since the filing of the Motion, however, V & E's fees exceed reasonableness. Services which are unnecessary because they duplicate those of other professionals representing the same interest (here the common interest of the Banks) are *per se* unreasonable. Considering the work on the Cooper Lighting matter and its involvement in discovery, the Court will allow V & E's fees and expenses in the amount of $12,000. Otherwise, as to the amounts sought for fees and expenses of V & E, the Motion will be DENIED.

### c. *Key's In–House Counsel*

■ The Motion seeks payment for the time of Key's in-house counsel. This item should be included in Key's overhead. The Motion, to the extent of fees sought for Key's in-house counsel, is therefore DENIED.

### d. *PWC*

■ PWC's fees were largely incurred prepetition. PWC was apparently em-

---

**33.** It is not clear to the Court whether this amount includes only time spent on Cooper Lighting or all time spent by V & E on recla- mation issues. As pointed out, above, n. 22, there were a number of reclamation issues in this case.

ployed pursuant to the forbearance agreements, since the Credit Agreement, unlike the former, makes no mention of employment by the Banks of financial advisors. PWC ceased work on the case by November 6, 2001. The Court finds that PWC's functions may have overlapped to some extent with those of MAA. However, in exchanging the higher priced services of PWC [34] for those of MAA after commencement of the case, the Banks exercised the sort of judgment which should have characterized their claims regarding V & E, default interest and (as discussed, *infra*) the collateral monitoring fee. Accordingly, as to the postpetition fees and expenses of PWC, from October 16 through November 6, 2001, the Motion is GRANTED.

### e. *MAA* ·

Though the Court questions whether MAA could be retained by the Banks under the Credit Agreement (*see* n. 14, *supra*), the Court will evaluate their services and authorize payment based on reasonableness. The Court finds that employment of MAA ceased to be reasonable as of November 10, 2001, by which time the Banks knew or should have known they would be paid in full.

The charges made by MAA appear otherwise to be reasonable (with the possible exception of Ms. Zielinski's time preparing and typing reports; Starzyk proffer of May 7th and Banks' Exhibit GG), though many of the functions served by MAA were duplicative of those the Debtor in Possession, as a fiduciary, is expected to perform.[35] Accordingly, as to MAA's fees and expenses between October 16, 2001 and November 10, 2001, the Motion is GRANTED; as to the balance of MAA's fees and expenses (including those charged in connection with prosecution of the Motion), the Motion is DENIED.

### D. *Expenses*

The Motion seeks reimbursement of employee expenses of $18,486.83 and wire charges of $1,828.00. The Court finds these to be reasonable and clearly covered by the Credit Agreement. Accordingly, to the extent these amounts were incurred post petition, the Motion will be GRANTED.

### E. *Collateral Monitoring Fee*

■ The Motion seeks payment of a collateral monitoring fee provided for under the Credit Agreement. The Court considers this an egregious example of overreaching by the Banks. According to Capriotti's testimony, the fee was charged for services to benefit the Debtor. The Court finds that neither the Debtor nor the estate benefitted from the collateral monitoring fee. Not only is the fee therefore not reasonable, its payment would arguably be fraudulent as to creditors. *See In re Peoria Braumeister Co.*, 138

---

**34.** Though, based on the testimony of Koskiewicz, PWC's hourly rates strike the Court as remarkably high given the experience of the professionals involved, as stated, *supra*, the Court will not become involved in setting hourly rates. Since the PWC postpetition component of the Banks' section 506(b) claim is small, the Court need not determine if the high rates were justified by efficiency.

**35.** The Banks made much of MAA's success in reducing the cost of the Debtor's employee retention program by requiring smaller payments to senior management. If there was a failure of Debtor to monitor itself properly in this regard, the system would likely have brought about the same result. The Court deferred approval of part of the program with respect to officers of the company to see what results they produced, for example. Hearing, November 21, 2002. The Committee and United States Trustee likely would have questioned the cost of the plan had there been no input from MAA.

F.2d 520 (7th Cir.1943). Moreover, the fee is duplicative of the work of MAA. Finally, the fee, which accrued on November 1, 2001, was for a service that had no purpose after November. For these reasons, as to the collateral monitoring fee, the Motion is DENIED.

### IV. *Conclusion*

The Court in this memorandum opinion does not intend to suggest that any professional involved in this case did not perform well the tasks assigned by the client. Rather it is the Court's view that the client—here the Banks—must take into account the nature of the case and the economies necessitated by bankruptcy in hiring professionals and directing their work. *See Hudson Shipbuilders,* 794 F.2d at 1055, 1057; *Wonder Corp.,* 82 B.R. at 190; *Beyer,* 169 B.R. at 655–6. Should a client fail to exercise reasonable discretion in the use of professionals, the estate and creditors ought not to suffer.

The overreaching evidenced in the Motion is glaringly obvious. The case law—in particular *Southland*—demonstrates the weakness of the claim to default interest. The services of V & E were blatantly unnecessary. V & E was at best a back-up to LLS, having no meaningful impact on the case's outcome for the Banks; at worst it served as a placebo for a nervous bank officer.[36] The effort to collect the collateral monitoring fee was totally unreasonable, especially given the nature of the proceedings and the course of administration of the case. The Banks may have under the Credit Agreement an arguable basis for each charge sought in the Motion, but what is allowed in the Credit Agreement is subject to section 506(b). Section 506(b) does not license the Banks to spend estate money freely, without regard to necessity and economy.

Defense of the Motion has no doubt been costly to the estate. The other creditors cannot on the facts fairly be charged as well for its preparation and prosecution.

Counsel for the Committee is directed to prepare and submit to the Court an order consistent with this memorandum opinion. Such order shall be served on counsel for the Debtor, Agent, the United States Trustee and each of the Banks upon submission to the Court.

---

**36.** There are no doubt cases where separate, general representation of bank group mem-bers could be reasonable. This is not one of them.